# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-03125-NYW

BARBARA L. MCGLOTHLEN,

      Plaintiff,

v.

KARMAN, INC.,

      Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

Magistrate Judge Nina Y. Wang

      This matter is before the court on Defendant Karman, Inc.'s ("Defendant" or "Karman") Motion to Dismiss Complaint (the "Motion"). [#15, filed May 16, 2017]. The undersigned considers the Motion pursuant to 28 U.S.C. § 636(c), and the Order of Reference dated May 22, 2017 [#18]. The court concludes that oral argument will not materially assist in the resolution of this matter. Accordingly, upon careful review of the Motion and associated briefing, the entire case file, and applicable law, the court **GRANTS** the Motion for the reasons stated herein.

## PROCEDURAL BACKGROUND

      On December 19, 2016, Plaintiff Barbara McGlothlen ("Plaintiff" or "Ms. McGlothlen") initiated this matter by filing her Title VII Complaint and proceeds in this matter *pro se*.[1] [#1]. The undersigned set a Scheduling Conference in this matter for February 23, 2017. [#4]. However, neither Party appeared for the Scheduling Conference, prompting the court to issue an

---

[1] Because Plaintiff proceeds *pro se*, this court construes her pleadings liberally, but will not act as her advocate. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). The court applies the same procedural rules and substantive law to Plaintiff as to a represented party. *See Murray v. City of Tahlequah*, 312 F.3d 1196, 1199 n.2 (10th Cir.2008); *Dodson v. Bd. of Cty. Comm'rs*, 878 F. Supp. 2d 1227, 1236 (D. Colo. 2012).

Order to Show Cause ordering Plaintiff to file proof of service on or before March 27, 2017, pursuant to Rule 4(m) of the Federal Rule of Civil Procedure, or to show cause as to why her case should not be dismissed for failure to prosecute pursuant to D.C.COLO.LCivR 41.1. [#6].

On March 1, 2017, the Clerk of the Court filed a letter from Plaintiff dated February 23, 2017, wherein Plaintiff requested an eight-week extension of the relevant deadlines set by the Order Setting Scheduling Conference due to recent health issues. [#7]. In consideration of Plaintiff's letter, this court discharged the Order to Show Cause and granted Plaintiff's request for an extension of time, resetting the Scheduling Conference for April 20, 2017. [#9]. The court then converted the Scheduling Conference to a Status Conference given Plaintiff's failure to file proof of service and Defendant's absence from the proceeding. [#12]. The court ordered Plaintiff to file proof of service on or before May 5, 2017, and again reset the Scheduling Conference. [*Id.*].

On May 3, 2017, Plaintiff filed an executed summons, indicating that Plaintiff served Defendant on April 25, 2017, and that Defendant's answer or response was due by May 16, 2017. [#14]. On May 16, 2017, Karman filed the instant Motion. [#15]. The court ordered Plaintiff to respond to the Motion on or before June 9, 2017, the same date as the Scheduling Conference. [#16; #21]. Plaintiff complied, and Defendant filed its Reply on June 23, 2017. [#23; #30]. Thus, the Motion is ripe for resolution.

## FACTUAL BACKGROUND[2]

On or about August 1, 2005, Ms. McGlothlen began working for Karman as a Technical Designer. [#1 at 5, 16]. Karman is the manufacturer of Roper, Stetson, and Tin Haul clothing and footwear. [*Id.* at 16]. When Plaintiff began her employment with Karman, Karman

_____

[2] The following facts, drawn from Plaintiff's Complaint, are accepted as true and viewed in a light most favorable to Plaintiff. *See Barnes v. Harris*, 783 F.3d 1185, 1191–92 (10th Cir. 2015).

2

maintained its offices at 14707 East 2nd Avenue in Aurora, Colorado. [*Id.*]. However, in March 2012, Karman moved its offices to 14100 East 35th Place, also in Aurora, Colorado. [*Id.*]. Plaintiff alleges that within three months of the move to the new office building, her health "took a dramatic turn for the worse"—she developed asthma, dyspnea, a cough, skin irritation, rashes, burning, stinging, fungal infection, eye irritation, eye infection, excessive sweating, fatigue, headaches, and lesions on her lungs. *See* [*Id.* at 9, 16-17]. Plaintiff alleges that, between June 2012 and September 2014, her deteriorating health caused her to miss work and to exhaust her sick and vacation leave as well as her Family Medical Leave Act ("FMLA") leave. [*Id.*]. *See also* [*id.* at 17 (detailing various trips to Urgent Care and doctors' offices, and prescribed treatments for her ailments). Plaintiff "determined the cause of [her] dramatic decline in health was Occupational Asthma." [*Id.*].

On April 11, 2013, Plaintiff spoke with her supervisor, Julie Clayton-Horne, regarding her belief that workplace conditions were the cause of her recent health issues. [*Id.* at 17]. During this conversation, Ms. McGlothlen provided Ms. Clayton-Horne with a handwritten time line, detailing her six Urgent Care visits within the preceding ten months and her recent diagnosis of asthma and skin rashes and irritation; however, Ms. Clayton-Horne would not review the timeline or discuss it with Plaintiff. [*Id.*]. The following day, Plaintiff alleges that she had a coughing-episode while at work after she inhaled something in the bathroom. [*Id.*]. Plaintiff explained what had happened to Ms. Clayton-Horne and expressed her concern about the possibility of mold in the building; Plaintiff left work early that day. [*Id.*]. The following week, Plaintiff worked from home on three separate days because she was still "sick and <u>scared</u> about the workplace air." [*Id.* (emphasis in original)].

Over the next month, Plaintiff's ailments became noticeably worse while she was at work. [*Id.* at 18]. Because of this, Plaintiff had tests conducted to see if she tested positive for mold and mycotoxins—both are commonly associated with Occupational Asthma. [*Id.*]. Plaintiff informed both Ms. Clayton-Horne and Ed Gruben of Human Resources that she tested positive for mycotoxins. [*Id.*].

On July 24, 2013, Ms. Clayton-Horne informed Plaintiff that Karman's office had been tested for mold and that Defendant was awaiting the results. [*Id.*]. Mr. Gruben allegedly told Plaintiff that she was a valuable employee, which was why Karman agreed to have the mold testing performed. [*Id.*]. Ultimately, the results of the mold testing "did not identify a problem with mold in the building," but Plaintiff's doctor, Dr. Mayer, sent a letter to Defendant requesting that it test the building for "possible degrading fiberglass lining in the HVAC ductwork and possible indoor air quality." [*Id.* at 19].

Plaintiff continues that, although Mr. Gruben received a copy of Dr. Mayer's letter, no additional testing occurred. [*Id.*]. Rather, on December 6, 2013, Plaintiff received a telephone call from a Claims Representative with Pinnacol Assurance, regarding a workers' compensation claim allegedly filed by Karman on her behalf without her knowledge or consent. [*Id.*]. Later that day, Plaintiff discussed the call with Ms. Clayton-Horne who allegedly informed Plaintiff that Karman felt obligated to file a workers' compensation claim based on Dr. Mayer's letter. [*Id.* at 20].

Following the filing of the workers' compensation claim, Plaintiff alleges that management's "attitude and friendliness toward [her]" had changed. [*Id.*]. Plaintiff indicates that she "believe[s] that Pinnacol Assurance informed Karman of the potential liability if [it] was found at fault and advised Karman to try and persuade me to resign so there would be no

liability." [*Id.*]. Ms. Clayton-Horne also hired a second Technical Designer in "October-November 2013" because of an increased workload, but Plaintiff alleges her workload did not increase and that the new Technical Designer received work that typically went to Plaintiff. [*Id.*].

Plaintiff's health continued to deteriorate between December 2013 and January 2014, ultimately resulting in a four-day hospital stay for the flu and asthma complications. [*Id.* at 20-21]. Following her discharge from the hospital, Plaintiff's doctors informed her not to return to work. [*Id.*]. On January 22, 2014, Plaintiff informed Ms. Clayton-Horne that she needed an additional month off work to recover; however, because Plaintiff had exhausted her sick and vacation leave, Ms. Clayton-Horne directed Plaintiff to contact Mr. Gruben about FMLA leave. [*Id.*].

Plaintiff returned to work following her FMLA leave on February 24, 2014. [*Id.* at 21-22]. On February 25, 2014, the Occupational Safety and Health Administration ("OSHA") conducted an investigation, pursuant to Plaintiff's request, into the air quality at Karman—OSHA informed Plaintiff that they did not find anything that could be the cause of her ailments. [*Id.*]. After OSHA's inspection, Plaintiff again noticed "a change in the attitudes of [her] co-workers, management, and supervisors." [*Id.*]. Specifically, Plaintiff began overhearing co-workers discussing her medical issues, and believed that her supervisors had disclosed this information to her co-workers without her consent. [*Id.*]. According to Plaintiff, Ms. Clayton-Horne berated her for thinking Karman's building was the cause of her ailments, and other co-workers tried to convince her that the conditions at Karman were not the cause of her ailments. [*Id.* at 22-23]. Plaintiff "realized then that Karman was trying to push [her] out as they felt they could not fire me or let me go because of the Worker's Compensation claim[.]" [*Id.* at 22].

Over the next several months, Plaintiff continued to have tests performed in hopes of identifying the cause of her ailments; however, these tests were unsuccessful. On May 15, 2014, Ms. Clayton-Horne moved Plaintiff to a different work area, but her symptoms continued. [*Id.*]. Plaintiff worked her last day at Karman on June 20, 2014. [*Id.*].

On June 24, 2014, Plaintiff informed Ms. Clayton-Horne that she was going to utilize the rest of her FMLA leave to focus on her health. [*Id.* at 24]. Plaintiff received an additional eight weeks of FMLA leave through August 15, 2014. [*Id.*]. However, on August 15, 2014, Plaintiff emailed Ms. Clayton-Horne and Wendy Caywood that she would not be returning to work due to Karman's office causing her ailments—Plaintiff also sought her benefits. [*Id.*]. Plaintiff then exchanged emails with Ms. Caywood who sought to clarify whether Plaintiff intended to resign, return to work with accommodations, or utilize additional leave time. [*Id.* at 24-25]. Plaintiff responded that she enjoyed working for Karman but could not return to work unless Karman remedied the cause of her ailments or moved her to a new location. [*Id.*]. Ms. Caywood appeared to interpret this to mean that Plaintiff sought additional leave, but informed Plaintiff that Karman could not guarantee that her position would still be available once she could return to work given that Plaintiff's doctors did not provide a date certain that Plaintiff could return. [*Id.*].

Plaintiff never returned to work for Karman. [*Id.* at 27]. Nor was she able to secure other employment, despite applying to other companies. [*Id.*]. Plaintiff alleges that Karman "blacklisted" her because of the workers' compensation claim. [*Id.*]. Plaintiff avers that she had an "excellent reputation in the garment industry as one of the best patternmakers in Colorado but [she] lost [her] reputation, [her] references, [her] career and income when [she] got sick when

Karman moved to the new location and when Karman filed a Worker's Compensation claim for me without [her] knowledge or permission." [*Id.* at 27-28].

On February 26, 2015, Plaintiff completed an Equal Employment Opportunity Commission ("EEOC") Intake Questionnaire indicating that Karman discriminated and retaliated against her because of disability, i.e., Occupational Asthma. *See* [*id.* at 5-11]. Though unclear, the Intake Questionnaire appears to predicate her discrimination claim on Mses. Clayton-Horne and Caywood's belief that Karman's office was not the cause of Plaintiff's ailments, and Karman's refusal to either fix the problem with their office or let Plaintiff work elsewhere. [*Id.*]. However, the EEOC dismissed Plaintiff's discrimination charge on September 16, 2016, determining that the evidence did not support such a claim. [*Id.* at 3].

Plaintiff thus filed suit in this court. [#1]. Plaintiff seeks monetary relief for her: (1) past and future wages and medical expenses; (2) damage to her reputation because of the workers' compensation claim; (3) damage to her privacy when Karman disclosed her ailments to co-workers; and (4) loss of quality of life; Plaintiff also seeks declaratory relief in the form of a notice to all past employees of Karman that the air quality in their office building caused medical issues. [*Id.* at 31].

## LEGAL STANDARDS

### I.    Rule 12(b)(1)

Federal courts are courts of limited jurisdiction and, as such, "are duty bound to examine facts and law in every lawsuit before them to ensure that they possess subject matter jurisdiction." *The Wilderness Soc. v. Kane Cty., Utah*, 632 F.3d 1162, 1179 n.3 (10th Cir. 2011) (Gorsuch, J., concurring). Indeed, courts have an independent obligation to determine whether subject matter jurisdiction exists, even in the absence of a challenge from any party. *Image*

*Software, Inc. v. Reynolds & Reynolds, Co.*, 459 F.3d 1044, 1048 (10th Cir. 2006) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006)). Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, a party may bring either a facial or factual attack on subject matter jurisdiction, and a court must dismiss a complaint if it lacks subject matter jurisdiction. *See generally Pueblo of Jemez v. United States*, 790 F.3d 1143, 1147 n.4 (10th Cir. 2015). For a facial attack, the court takes the allegations in the Complaint as true; however, when reviewing a factual attack, the court may not presume the truthfulness of the Complaint's factual allegations and may consider affidavits or other documents to resolve jurisdictional facts. *Holt v. United States*, 46 F.3d 1000, 1002-03 (10th Cir. 1995). The burden of establishing jurisdiction rests with the party asserting jurisdiction. *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974).

## II.     Rule 12b(b)(6)

Under Rule 12(b)(6) a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion under Rule 12(b)(6), the court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff."[3] *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)). Nevertheless, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Hall*, 935 F.2d at 1110 (holding that even *pro se* litigants cannot rely on conclusory, unsubstantiated allegations to survive a 12(b)(6) motion). Rather, "a complaint must

---

[3] However, the court may consider materials outside the complaint without converting a motion to dismiss to one for summary judgment if the documents are central to the plaintiff's claims, referred to in the complaint, and if the parties do not dispute their authenticity. *See Cty. of Santa Fe, N.M. v. Public Serv. Co. of N.M.*, 311 F.3d 1031, 1035 (10th Cir. 2002).

contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (explaining that plausibility refers "to the scope of the allegations in a complaint," and that the allegations must be sufficient to nudge a plaintiff's claim(s) "across the line from conceivable to plausible."). The ultimate duty of the court is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

## ANALYSIS

Defendant moves to dismiss Plaintiff's Complaint in its entirety for three reasons. First, Defendant argues that Plaintiff's Complaint fails to plead a cognizable claim that plausibly suggests she is entitled to relief. [#15 at 5-10]. Second, Defendant contends that this court lacks subject-matter jurisdiction over any claim of discrimination based on a disability because Plaintiff failed to file her EEOC charge within the specified period for doing so.[4] [*Id.* at 10-13]. Lastly, Defendant avers that this court lacks jurisdiction over any claim seeking to recover for injuries sustained while working for Karman, as the Colorado Workers' Compensation Act ("CWCA") is the exclusive remedy for any such claim. [*Id.* at 13-15]. The court first considers its subject matter jurisdiction to entertain any alleged claim for recovery of damages sustained by Plaintiff while working for Defendant, and continues with a discussion as to whether Plaintiff

---

[4] Though Defendant argues for dismissal under Rule 12(b)(1), Plaintiff's timely filing of an EEOC charge is a condition precedent to bringing suit in federal, it is not jurisdictional; accordingly, such arguments are more appropriately analyzed under Rule 12(b)(6). *See Belhomme v. Widnall*, 127 F.3d 1214, 1216 n.1 (10th Cir. 1997) (explaining, "current case law treats the filing deadline not like a non-waivable question of subject-matter jurisdiction, but rather as a waivable statute of limitation that is subject to equitable tolling."); *McDonald v. Sch. Dist. No. 1 in the Cty. of Denver & Colorado*, 83 F. Supp. 3d 1134, 1140 (D. Colo. 2015) (analyzing a timeliness challenge to the plaintiff's Title VII claim under Rule 12(b)(6)).

pleads a plausible claim under the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12112(a).

## I.    Colorado Workers' Compensation Act – Colo. Rev. Stat. § 8-41-102

"Under Colorado law, the exclusive remedy against statutory employers is workers' compensation insurance." *Stuart v. Colorado Interstate Gas Co.*, 271 F.3d 1221, 1224 (10th Cir. 2001) (citing Colo. Rev. Stat. §§ 8–41–102). "The Workers' Compensation Act provides exclusive remedies for employees suffering work-related injuries and occupational diseases." *Horodyskyj v. Karanian*, 32 P.3d 470, 474 (Colo. 2001). Accordingly, the CWCA bars civil tort actions against an employer for injuries that are compensable under the CWCA. *See Radil v. Sanborn W. Camps, Inc.*, 384 F.3d 1220, 1224 n.2 (10th Cir. 2004) (citing Colo. Rev. Stat. §§ 8-41-102, 104).

Defendant argues that Plaintiff's Complaint essentially alleges that she developed Occupational Asthma and contact dermatitis while working for Karman, and that Karman should compensate her for these injuries. [#15 at 13]. However, Defendant argues that these alleged injuries or illnesses were subject to the workers' compensation claim filed by Karman on Plaintiff's behalf in December 2013 and, thus, the CWCA bars any tort claim seeking monetary recovery for such injuries. [*Id.* at 14]. Plaintiff responds that Karman filed the workers' compensation claim on its behalf, not on her behalf; that Karman did so without her knowledge; and that the claim "was filed 17 months after she first got sick[.]" [#23 at 5, 20, 22, 24]. An overwhelming majority of Plaintiff's Response and accompanying exhibits[5] detail her medical ailments and medical history, but fail to address the legal issue raised by Karman. *See generally* [#23]. This court's review of Plaintiff's Response, and her Complaint, indicates that she is

---

[5] *See* [#24] - [#29]. Plaintiff submitted hundreds of pages of exhibits in addition to her response, many of which are immaterial to this court's consideration of the instant Motion.

attempting to allege a tort claim to recover for her injuries sustained while working for Defendant. *See* [#1 at 2; #30 at 5].

As discussed, "[t]he exclusive-remedy provisions of the [CWCA] bar civil actions in tort against an employer for injuries that are compensable under the Act. [].  An employer that has complied with the [CWCA] is granted immunity from common-law actions for damages, and its employees are limited to the remedies specified in the act."  *Rundle v. Frontier-Kemper Constructors, Inc.*, 170 F. Supp. 2d 1075, 1078 (D. Colo. 2001) (citations omitted).  "The express purpose of the WCA is to provide 'quick and efficient delivery of disability and medical benefits,'" for injuries sustained on the job.  *Serna v. Kingston Enterprises*, 72 P.3d 376, 379 (Colo. App. 2002) (quoting Colo. Rev. Stat. § 8-40-102(1)).

Here, Plaintiff alleges that she contracted Occupational Asthma and contact dermatitis while working at Karman's new office building located at 14100 East 35th Place, Aurora, Colorado.  [#1 at 16].  The Complaint further alleges that Karman submitted a workers' compensation claim on Plaintiff's behalf in December 2013.  [*Id.* at 19]; *see also* Colo. Rev. Stat. § 8-43-103(1) ("Notice of an injury, for which compensation and benefits are payable, shall be given by the employer to the division and insurance carrier, unless the employer is self-insured"). And, although Plaintiff alleges that Karman filed the claim without her permission or consent, there is no indication that Plaintiff properly "disclaimed or objected to" the claim "in writing filed with the division within a reasonable time."  Colo. Rev. Stat. § 8-43-103(1) (providing that *anyone* may file a claim on an employee's behalf, but that the claimant must specifically object to or disclaim the claim in writing).  Accordingly, the court concludes that CWCA bars any claim for recovery against Karman for injuries relating to her Occupational Asthma and contact dermatitis, and must be **DISMISSED**.  *See Radil*, 384 F.3d at 1226 (explaining that under

Colorado law, the CWCA bars civil tort suit against the employer "thus making such claims non-cognizable in state and federal court").

## II.    The ADA - 42 U.S.C. § 12112(a)

Defendant also moves to dismiss any claim Plaintiff alleges under the ADA for two reasons. First, any claim under the ADA is untimely, as Plaintiff failed to file her EEOC charge within 300 days of any alleged discriminatory conduct by Karman. [#15 at 10; #30 at 7]. Nonetheless, Defendant contends that Plaintiff fails to allege that she suffered any adverse employment action or that her disability was the cause of such action. [#15 at 7-10; #30 at 5-8]. For the following reasons, the court respectfully concludes that Plaintiff fails to allege any viable claim under the ADA.

### A.    Timeliness

First, Defendant argues that Plaintiff's ADA claims are untimely. [#15 at 10; #30 at 7]. Specifically, despite Plaintiff's allegation that she filed her EEOC charge on March 2, 2015, she did not sign the EEOC charge until May 20, 2015, and it was not filed until May 26, 2015. [#15 at 10]. This is because, Plaintiff's EEOC Intake Questionnaire, filed March 2, 2015, does not satisfy the "charge" requirement under Title VII. [*Id.* at 11-13]. Accordingly, any purported discriminatory conduct by Karman did not occur within the 300 days preceding the filing of an EEOC charge. Rather, most of Plaintiff's allegations concern events in 2012, 2013, and early 2014, and Plaintiff's decision to cease working for Karman on June 20, 2014, and related decision to not return to Karman on August 18, 2014, when her FMLA leave expired, all occurred well outside the 300-day limitation. *See* [*Id.* at 10-13; #30 at 7].

Plaintiff responds that she filed her charge with the EEOC on March 2, 2015, the date the EEOC received her Intake Questionnaire. [#23 at 21]. Plaintiff avers that she received a letter

from the EEOC dated May 15, 2015, indicating that, upon the completion of the required EEOC Form 5, the EEOC would investigate her charge and would consider March 2, 2015 as the filing of that charge. [*Id.*]. The court respectfully agrees that March 2, 2015, constitutes the date Plaintiff filed her charge with the EEOC.

In her Complaint, Plaintiff incorporates her completed EEOC Intake Questionnaire dated February 26, 2015. [#1 at 5-11]. She indicates on that form that she desires to file a charge against Defendant and authorizes the EEOC to investigate her allegations of discrimination. [*Id.* at 11]. The Complaint also alleges that she formally filed her charge on March 2, 2015, and received a Notice of Right to Sue on September 19, 2016. [*Id.* at 2]; *see also Semsroth v. City of Wichita*, 304 F. App'x 707, 714 (10th Cir. 2008) (unpublished) (holding that an EEOC Intake Questionnaire, combined with letters from the EEOC and a Right-to-Sue notice, reasonably constituted a "charge" for the purpose of Title VII). Further, the May 15, 2015 EEOC letter states that the EEOC received Plaintiff's Intake Questionnaire, determined that the matter complained of is subject to the ADA, and that "the document [Plaintiff] submitted [i.e., the Intake Questionnaire] constitute[d] a charge of employment discrimination, . . . and [that the EEOC] notified the employer that you filed a charge." *See* [#29-8 at 2].[6] Accordingly, the court respectfully concludes that Plaintiff filed her "charge" with the EEOC on March 2, 2015; thus, the events of June 20, 2014 and August 18, 2014, both occurred within the 300-day limitation period (i.e., May 6, 2014). However, any allegation that the filing of the workers' compensation claim in December 2013 constituted discriminatory conduct is untimely.

---

[6] This court considers the May 15, 2015 EEOC letter without converting Defendant's Motion to Dismiss to a Motion for Summary Judgment because this letter is central to Plaintiff's Complaint, the Intake Questionnaire is incorporated in the Complaint, and neither Party appears to dispute the letter's authenticity. *See Cty. of Santa Fe, N.M.*, 311 F.3d at 1035.

Nonetheless, Defendant argues that Plaintiff did not suffer an adverse employment action, nor does Plaintiff allege that her disability was the cause of any adverse action. *See* [#15 at 12-13; #30 at 7]. The court considers these arguments as to the events of June 20 and August 18, 2014, below.

### B. Discrimination

The ADA prohibits discrimination against disabled individuals. 42 U.S.C. § 12112(a). To state a prima facie case for discrimination under the ADA, Plaintiff must establish that (1) she is disabled; (2) she was qualified, with or without reasonable accommodation, to perform the essential function of his job; and (3) her employer discriminated against her because of her disability. *Robert v. Bd. of County Comm'rs*, 691 F.3d 1211, 1216 (10th Cir. 2012) (considering the standard within the context of a wrongful termination claim). "To demonstrate 'discrimination,' a plaintiff generally must show that [s]he has suffered an adverse employment action because of the disability." *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 896 (10th Cir. 2017) (internal quotations and citation omitted).

### i. Disability

The ADA Amendment Act of 2008 ("ADAAA") went into effect on January 1, 2009 and provides for a broader construction of the definition of disability. *Crowell v. Denver Health & Hosp. Authority*, 572 F. App'x 650, 658 (10th Cir. 2014) (citing 42 U.S.C. § 12102(4)(A) ("The definition of disability in this chapter shall be construed in favor of broad coverage ... to the maximum extent permitted by the terms of this chapter."). "Disability" now includes an "impairment that is episodic or in remission if it would substantially limit a major life activity when active; examples include epilepsy, hypertension, asthma, diabetes, major depression, bipolar disorder, schizophrenia, and cancer." *Ellis v. Educ. Comm'n for Foreign Med.*

*Graduates*, No. CIV.A. H-14-2126, 2015 WL 3866728, at *5 (S.D. Tex. June 23, 2015) (citing ADAAA, Sec. 4, § 3(4)(D), 122 Stat. 3553, 3555; 29 C.F.R. § 1630(j)(5)). "Major life activities" also now includes major bodily functions. *Id.* (citing ADAAA, Pub.L. No. 110–325, Sec. 4, § 3(2)(A) and (B), 122 Stat. 3553, 3555); *see also* 29 C.F.R. § 1630.2(i)(1)(i) (listing breathing as an example of a major life activity).

Defendant, in passing, challenges whether Plaintiff adequately pleads a disability. *See* [#15 at 9; #30 at 6]. Defendant appears to rely on the undersigned's conclusion in *Watson v. UPS Ground Freight, Inc.* wherein this court held that Mr. Watson failed to allege that his asthma was a disability. 2016 U.S. Dist. LEXIS 58639, *10-*12 (D. Colo. May 3, 2016). However, unlike *Watson*, Ms. McGlothlen alleges that she suffers from Occupational Asthma, that she frequently utilized an emergency inhaler at work or at home, that she frequently utilized a nebulizer at home to alleviate her symptoms, and that she frequently missed work because of her asthma. *Compare* [#1] *with Watson*, 2016 U.S. Dist. LEXIS 58639, at *10-*12. Accordingly, the court respectfully concludes that Plaintiff sufficiently alleges that her Occupational Asthma constitutes a disability to overcome a motion to dismiss. *See Doebele v. Sprint/United Management Co.*, 342 F.3d 1117, 1129 (10th Cir. 2003) (plaintiff must articulate with precision not just the impairment alleged but "the major life activity affected by that impairment").

### ii.     Adverse Action

Defendant also moves to dismiss Plaintiff's Complaint because she fails to plead that she suffered an adverse employment action. [#15 at 7, 9-10; #30 at 6-7]. For instance, it was Plaintiff's decision to cease working for Karman on June 20, 2014, and it was Plaintiff's decision not to return to Karman after her FMLA leave expired on August 18, 2014. *See* [#15 at 7; #30 at

6]. Moreover, Defendant argues that it filed a workers' compensation claim on her behalf, granted her FMLA requests, and placed her on extended leave after her FMLA leave expired—none of which constitute an adverse action. [#30 at 6].

Courts in this Circuit liberally define the phrase "adverse employment action," and employ a case-by-case approach when determining whether an adverse action occurred. *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999). "In general, only acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits will rise to the level of an adverse employment action," and Plaintiff must demonstrate that the adverse action caused more than *de minimis* harm to her job opportunities or status. *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1040 (10th Cir. 2011) (internal brackets, quotations, and citations omitted). "One factor that strongly indicates a challenged action is an 'adverse employment action' is that the action causes 'harm to future employment prospects.'" *Hillig v. Rumsfeld*, 381 F.3d 1028, 1031 (10th Cir. 2004) (quoting *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986-87 (10th Cir. 1996) (explaining that an adverse action may be found where an employer's actions carry "a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects."))).

Here, Plaintiff alleges that she informed Ms. Clayton-Horne of her decision to take her remaining FMLA leave on June 24, 2014, and that, upon the expiration of her FMLA leave on August 18, 2014, she informed Ms. Caywood that she would not be returning to work for Karman at 14100 East 35th Place, Aurora, Colorado. [#1 at 23-24]. Ms. Caywood also informed Plaintiff that Karman could not guarantee that her position would be available upon her return, given that Plaintiff's doctors did not identify a date certain she would (or could) return to

work.  [*Id.* at 25].  Defendant is correct that Plaintiff has not alleged "that she was discharged, demoted, reassigned, [or] refused a promotion."  [#15 at 8].  Plaintiff does allege that Karman "blacklisted" her by filing a workers' compensation claim on her behalf and that this caused damage to her reputation, references, and career, as she could not secure other employment, *see* [#1 at 27-28].  However, as discussed, any allegation that the workers' compensation claims constituted adverse employment action is untimely.[7]

Further, this court respectfully concludes that, to the extent Plaintiff alleges that Karman constructively discharged her, such allegations fail to state a plausible claim.  "A constructive discharge occurs when an employer, through *unlawful* acts, makes working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign." *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1135 (10th Cir. 2004) (emphasis added).  "The plaintiff's burden in establishing constructive discharge is substantial."  *Fischer v. Forestwood Co.*, 525 F.3d 972, 980 (10th Cir. 2008).  Here, Plaintiff alleges that, subsequent to OSHA's

---

[7] Even if it considered Ms. McGlothlen's allegations that she was "blacklisted," this court concludes that Karman's filing of a workers' compensation claim on Plaintiff's behalf does not constitute an adverse employment action.  *Cf. Campbell v. N.Y. City Transit Auth.*, 93 F. Supp. 3d 148, 170 (E.D.N.Y. 2015) (holding that the defendant's controverting the plaintiff's workers' compensation claim did not constitute an adverse employment action).  Though Plaintiff alleges that, following the filing of her workers' compensation claim on December 6, 2013, she noticed a change in "management's attitude and friendliness towards [her]," Plaintiff remained employed through June 20, 2014 (when she decided to take her remaining FMLA leave) to August 18, 2014 (when she informed Karman she would not return upon the expiration of her FMLA leave).  Plaintiff also alleges that Karman provided additional leave for Plaintiff despite her refusal to return to Karman's current offices.  [#1 at 24-25].  Further, despite Plaintiff's allegation that Karman "blacklisted" her by filing the workers' compensation claim, Plaintiff also alleges that her health prohibited her from doing much, that she "did not know if she could work full time because of [her] health," that "she did not think she could travel [] to China or Mexico" for work, and that her home became her "safety zone."  [#1 at 27].  Thus, it does not appear that the workers' compensation claim caused a significant change in benefits.  *C.R. England, Inc.*, 644 F.3d at 1040; *accord MacKenzie v. City & Cty. of Denver*, 414 F.3d 1266, 1279 (10th Cir. 2005) ("While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." (internal quotations and citation omitted)).

investigation, she realized that Defendant was trying to "push [her] out" because they could not fire her or let her go, that management's attitude and friendliness towards her changed, that Ms. Clayton-Horne berated her for thinking that the building made her sick, and that she "believes" that Pinnacol Assurance advised Karman "to try and persuade me to resign so there would be no [workers' compensation] liability." [#1 at 20, 22-23].

The Complaint is devoid of specific factual allegations that Karman employees made working conditions so intolerable to cause her to resign from work. Ms. McGlothen includes in her Complaint some allegations that "[a]fter OSHA was there several management people (who knew about this) including the president would not make eye contact or greet me." [*Id.* at 8]. She further alleges that then she "started hearing people (non-management) walking in the hallway by my office talk about my having asthma and that it was environmental." [*Id.*]. She also asserts that the front receptionist indicated that if the building was making her sick, then she could surely find a job elsewhere. [*Id.*]. But constructive discharge entails something more than hostility perceived on the part of Plaintiff; it requires that a plaintiff demonstrate the working conditions are so intolerable that it forces an employee to quit. *Exum*, 389 F.3d at 1135. Even taking these allegations as true, these comments simply do not arise to the kind of comments that would make the working environment so intolerable as to force a person of ordinary firmness to resign.

Instead, the factual allegations in the Complaint reflect Ms. McGolthlen's decision, based on advice by her physicians, that Karman's office building made her too sick to continue working, and it was her decision to cease working for Karman. [#1 at 2, 8 ("I cannot return to work in that building with poor indoor air quality that has made me sick.")]. And while she alleges that Karman failed to move her to another location, Ms. McGlothen points this court to

no allegations in the Complaint that she could have performed her work remotely, or that Karman had another location at which she could work, or that Karman allowed others to work at any space other than the office building located at 14100 East 35th Place, Aurora, Colorado. *See generally* [#1]. Nor does she allege adequate facts that Karman unlawfully refused to remediate the environment after learning that something in its environment was the cause of her symptoms. Rather, Ms. McGlothlen concedes in her Response that the testing of the environment found that the concentrations for fiberglass and organic contaminants, including 61 airborne contaminants, fell below the OSHA limits. [#23 at 6]. The Complaint further indicates that Karman and Pinnacol Assurance both tested for contaminants that could make Ms. McGlothlen ill, but neither found anything. [#1 at 8]. Nor are there allegations that Karman forced Ms. McGlothlen to work, despite her health issues, or refused to grant her medical leave when requested.

Instead, it appears that Ms. McGlothlen resigned due to her health and her strongly-held belief that those health issues were caused by Karman's building, and that when told of Plaintiff's continuing health issues, Karman gave Plaintiff the choice as to whether she was resigning, returning to work, or requesting additional leave (which she eventually received) on June 20, 2014, and again on August 18, 2014. [*Id.* at 23-25]. *See also Yearous v. Niobrara Cty. Mem'l Hosp.*, 128 F.3d 1351, 1357 (10th Cir.1997) ("[T]he question at this stage is whether Plaintiff[], at the time of [her] [] resignation[], had the opportunity to make a free choice regarding [her] employment relationship"). Reviewing her Complaint as a whole, Plaintiff fails to allege sufficient facts that Karman constructively discharged her to survive dismissal. *See*

*Exum*, 389 F.3d at 1135 ("[A] plaintiff who voluntarily resigns cannot claim that he or she was constructively discharged.").[8]

Because Plaintiff fails to allege that she suffered an adverse employment action, Plaintiff's ADA discrimination claim also fails for want of an allegation that she suffered an adverse employment action because of her disability.[9] *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1308 (10th Cir. 2017). Therefore, Plaintiff's ADA discrimination claim is **DISMISSED** for failure to state a plausible claim for relief.

### C. Failure to Accommodate

Discrimination under the ADA also includes an "employer's not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." *Crowell*, 572 F. App'x at 658 (quoting 42 U.S.C. § 12112(b)(5)(A)). Under the ADA, the accommodation requested must be "reasonable." 42 U.S.C. § 12112(b)(5)(A). *See also Mason v. Avaya Commc'ns, Inc.,* 357 F.3d 1114, 1124 (10th Cir. 2004). Reasonable accommodations are defined as, "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position" or "[m]odifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other

---

[8] In so ruling, this court in no way passes on whether Ms. McGlothlen's illness was caused by environmental factors in Karman's building. The court simply finds that the allegations as stated in the Complaint, even taken as true, do not amount to constructive discharge as a matter of law.

[9] *See also Anderson*, 181 F.3d at 1179 (advising that a one and one-half month period between protected activity and adverse action may, by itself, establish causation, whereas a three-month period, standing alone, is insufficient to establish causation). Here, Karman filed the workers' compensation claim in December 2013, and Plaintiff eventually took her extended leave in August 2014—an approximately eight-month gap between the alleged adverse action and when Plaintiff ceased working for Karman.

similarly situated employees without disabilities." *E.E.O.C. v. Picture People, Inc.*, 684 F.3d 981, 987 (10th Cir. 2012) (quoting 29 C.F.R. § 1630.2(o)(1)(ii)-(iii)).  The ADA does not, however, require an employer to relieve an employee of an essential job function, *id.* (citing *Mason*, 357 F.3d at 1122); nor is an employer required to "reallocate job duties in order to change the essential function of a job." *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1124-25 (10th Cir. 1995).

Defendant argues that Plaintiff fails to allege how it failed to reasonably accommodate her disability.  [#15 at 7; #30 at 7].  Rather, Plaintiff alleges that Karman inspected the building for mold, but did not find anything that would cause Plaintiff's ailments, and that it moved her to a new location within the building to see if that would help alleviate Plaintiff's symptoms.  [#15 at 7-8; #30 at 7].  Plaintiff's Complaint and Response imply that this was not sufficient.  *See* [#1 at 23; #23 at 20 ("The only accommodation Julie ClaytonHorne (sic) would discuss with her was moving her office within the building.").

Instead, Plaintiff wanted to be transferred to a new location, unless Karman could identify and remediate the issues.  [#1 at 24-25].  However, two inspections of the building did not reveal what could have caused Ms. McGlothlen's ailments.  Thus, the only accommodation reasonable to Plaintiff was a transfer to a new location.  However, as discussed above, there is no allegation that Karman maintained other locations or that Plaintiff could perform the essential functions of a Technical Designer (e.g., working with vendors and hundreds of garments each season; and measuring, fitting, constructing comments and specification compliance on pre-production and top of production samples) at a different location.  *See Milton.*, 53 F.3d 1124-25 (holding that a request to work from home was not a reasonable accommodation if it eliminates an essential function of the job); *cf. Smith v. Midland Brake, Inc., a Div. of Echlin, Inc.*, 180 F.3d

1154, 1174 (10th Cir. 1999) ("It is not reasonable to require an employer to create a new job for the purpose of reassigning an employee to that job."). Accordingly, Ms. McGlothlen's failure to accommodate claim is **DISMISSED** for failure to state a cognizable claim.

### D. Retaliation

The ADA expressly prohibits retaliation against individuals who make charges under or otherwise exercise rights granted by the law. *See* 42 U.S.C. § 12203. Though not apparent from Plaintiff's pleading, the Complaint indicates that she also alleged a retaliation claim against Karman in her EEOC charge. [#1 at 6]. However, the absence of any adverse employment action is equally as fatal to any retaliation claim. Additionally, Plaintiff filed her EEOC charge in March 2015, nearly seven months after she ceased working for Karman; thus, Plaintiff cannot maintain that she was caused to resign in retaliation for her filing an EEOC charge.[10] *Doebele*, 342 F.3d at 1135 (explaining that a plaintiff must demonstrate that she engaged in protected activity and suffered an adverse employment action because of the protected activity). Accordingly, any ADA retaliation claim is also **DISMISSED.**

### CONCLUSION

Therefore, for the reasons stated herein, **IT IS ORDERED** that:

(1) Defendant Karman, Inc.'s Motion to Dismiss Complaint [#15] is **GRANTED**;

(2) Plaintiff's Complaint [#1] is **DISMISSED without prejudice**; and

(3) The Clerk of the Court shall **TERMINATE** this matter accordingly.

---

[10] Nor is this a case where Plaintiff alleges that Karman retaliated against her because she filed a workers' compensation claim on her own behalf, as Karman filed the workers' compensation claim. *See Anderson v. Royal Crest Dairy, Inc.*, 281 F. Supp. 2d 1242, 1249 (D. Colo. 2003) ("The Colorado Supreme Court has also recognized that an employee is granted the specific right to apply for and receive compensation under the Workers' Compensation Act and an employee who is terminated for exercising this right may state a cognizable claim for wrongful discharge in violation of public policy.").

DATED:  July 6, 2017

BY THE COURT:

_s/ Nina Y. Wang_____
Nina Y. Wang
United States Magistrate Judge